**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 26-211** |
| **v.** | * | **SECTION: "P"** |
| **ABDEL ADHAMI**<br>**OMAR ADHAMI** | * | |

* * *

**MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO STAY DEFENDANTS' RELEASE AND REVOKE THE MAGISTRATE'S RELEASE ORDER**

**MAY IT PLEASE THE COURT:**

**NOW COMES** the United States of America, by and through Gregory M. Kennedy, Assistant United States Attorney for the Eastern District of Louisiana, and, pursuant to Title 18, United States Code, Section 3145(a) and (c), who requests that this Court stay the release of the defendant and revoke the Magistrate's release order. Indeed, the Government submits that defendants Abdel Adhami and Omar Adhami should be detained because they are a serious flight risk and because they pose a risk of danger to the community, such that there is no condition or combination of release conditions that will adequately alleviate these concerns. 18 U.S.C. § 3142(e). Furthermore, the defendants have not rebutted the presumption of detention of the defendants.

## PROCEDURAL HISTORY

On September 14, 2026, Abdel and Omar Adhami were arrested. Abdel Adhami was charged by Complaint with providing material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, wire fraud, in violation of Title 18,

United States Code, Section 1343, and money laundering, in violation of Title 18, United States Code, Section 1956. Rec. Doc. 1. Omar Adhami was charged in a separate Complaint with providing material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, and wire fraud, in violation of Title 18, United States Code, Section 1343. Rec. Doc. 1. Both Abdel Adhami and Omar Adhami were indicted together on September 17, 2026, with providing material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, conspiracy to provide material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956.

The defendants were in court on September 16, 2026 for an initial appearance. Rec. Doc. 8. However, the initial appearance could not be held due to language issues and was reset to September 18, 2026. *Id.* A detention hearing and arraignment were scheduled for September 21, 2026. *Id.* The detention hearing was reset to September 30, 2026, to allow the defendants to determine counsel. Rec. Doc. 17. After the Federal Public Defender's office was appointed to represent the defendants, the detention hearing was reset to October 5, 2026, to allow for a defense witness to testify. Rec., Doc 25. On that date, the detention hearing was reset to October 7, 2026. Rec. Doc. 35. On October 7, 2026, the hearing was reset one final time to October 14, 2026 because Magistrate Judge North wanted an Arabic translator to testify as to jail calls made by the defendants. Rec. Doc. 42. On October 14, 2026, the detention hearing was held, and Magistrate Judge North ordered the defendants released on bond. Rec. Docs. 36, 37.

Accordingly, the government is requesting that this Court grant the government's Motion to Stay Defendants' Release and to Revoke the Magistrate's Release Order.

## ARGUMENT

Jurisdiction over the review of the release order issued by the Magistrate Judge in the district of arrest lies with this Court, because this Court has original jurisdiction over the charged offenses, pursuant to 18 U.S.C. § 3145(a)(1). That section provides that:

> (a) Review of a release order – If a person is ordered released by a magistrate, . . .
>
> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . . . The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention, as if the Court were reviewing its own action. *See United States v. Thibodeaux*, 663 F.2d 520, 522 (5th Cir. 1981) (then construing 18 U.S.C. § 3147, where the current 18 U.S.C. § 3145 was formerly codified) ("The statutory scheme adopted in [18 U.S.C. § 3145] confers a responsibility on the district court to reconsider the conditions of release fixed by another judicial officer . . . as unfettered as it would be if the district court were considering whether to amend his own action. He is not constrained to look for abuse of discretion or to defer to the judgment of the prior judicial officer."); *see also United States v. Leon*, 766 F.2d 77, 80 (2nd Cir. 1985) ("In our view a district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion."). *See United States v. Rueben*, 974 F.2d 580, 585-86 (5th Cir. 1992) ("[T]he district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release."); *United States v. Delker*, 757 F.2d 1390, 1394-95 (5th Cir. 1985). Accordingly, in its discretion, this Court may proceed to rehear the evidence to support detention by recalling the

witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not raised previously. In short, the Court may proceed, as best enables, it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the safety of any other person and the community and/or assure the defendant's presence at trial.

Furthermore, based on the serious nature of the charge in the indictment, there is a rebuttable presumption that no condition or combination of conditions exist that will assure the appearance of the defendant or safety of the community the based on the applicable statute. 18 U.S.C. Sections 3142(e)(3)(C) and 2332b(g)(5)(B).

Whereas the BRA provides the burden of proof required to demonstrate that the defendant is a danger to an individual or the community, the BRA is silent as to the burden of proof required to demonstrate that the defendant is a "flight risk." The United States Court of Appeals for the Fifth Circuit has applied "the simple preponderance standard," meaning "it is more likely than not that no condition or combination of conditions will reasonably assure the accused's appearance." *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985) (citations omitted).

The government must show the risk of danger to the community by clear and convincing evidence. *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); 18 U.S.C. § 3142(f). "For pretrial detention to be imposed on the defendant, the lack of reasonable assurance of either the defendant's appearance, or the safety of others or the community is sufficient; both are not required." *Rueben*, 974 F.2d at 586. The factors to be considered in making such a determination are outlined in 18 U.S.C. § 3142(g), and include: (1) the nature and circumstances of the offense charged; (2) the weight of evidence against the defendant; (3) the history and characteristics of the

defendant, including past conduct, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

The government asserts that the evidence shows that there are no conditions of release that would assure the defendants' appearance for future court hearings or reasonably assure the safety of the community. The serious nature of the charges returned by the grand jury, the possible sentence that can be imposed, and the defendants' ties to a foreign terrorist organization, Hamas members, foreign persons, property, and money, the defendants' hiding of assets, and the ability to raise large sums of money establish that the defendants pose a serious flight risk and a significant risk of danger to the community.

The nature and circumstance of the charges and the weight of evidence against the defendants is contained within the Complaints and the Indictment. Rec. Docs. 1 and 9. It shows that since October of 2023, Abdel Adhami and Omar Adhami combined made at minimum 137 transfers totaling $103,438.34 to Hamas through a Hamas-third party in France. Rec. Doc. 9. This was to a terrorist organization that on October 7, 2023, committed its most violent, large-scale terrorist attack to date. In the early morning hours of October 7, 2023, Hamas sent more than 2,000 armed fighters into farms, towns and a festival in southern Israel, where they massacred over 1,000 people, committed sexual assaults, and kidnapped more than 200 others. *Id.* Hamas terrorists attacked civilians, firing handguns, assault rifles, and handheld rocket launchers in the attack. *Id.* Both defendants communicated directly with Saleem Alzaq, a known member of Hamas in Gaza. and tried to hide their financial support by using code words that attempted to make their financial support appear to benefit those in need. *Id.* On November 4, 2023, less than a month after the attack, Abdel Adhami sent a message to Omar Adhami that shows they knew exactly who they were communicating with and who the money was going to:

> Omar, listen! I was talking with that guy and I told him, one helps the children, and those in need, but what can one do for our brothers, those guys, the true men, do you understand me? And he told me not to worry, we are giving them as well. Every time we are in passion of sum of money, or if someone sends us money, we cook a meal and give the true men portion of the meal. So, I told him if that is what you do, I then will transfer money to you on daily basis, God willing. If one sends $10 or $20 a day, because the prophet said, "He who equips a fighter is as if he has taken part in the fighting himself." So, I myself will transfer money to him on daily basis, God willing. I will send whatever amount I can afford. I dedicated myself and portion of everything I have to the true men, and the other portion for the children and those in need. When you talk to him, do not say like that. He uses the word "bread". So, when you want to send something, you tell him, "This amount for the bread", and he will understand. Don't mention anything by its name on WhatsApp and use the word "bread" instead. You can say, "This amount for the bread, two dozens of bread, or May God strengthen the bread! Or something like that.

*Id.* The indictment detail numerous communications between the defendants and Alzaq. *Id.* By supporting Hamas financially, both defendants were equating giving money to Hamas the same as if they were engaging in the fighting themselves.

On the same day, Abdel Adhami additionally engaged in recruiting others to send money to Hamas, including his business partner Raed Yousef in Tampa[1]. He sent an audio message to Yousef that stated:

> "Praise be to God, Lord of the Worlds. I mean that I send them an amount of money on daily basis. . .Uh. . .Uh, at least we are feeding them. Do you understand me? They have meals cooked for them, and food reaches them and they eat, but you shouldn't talk about anything. Here we tell them, we say bread. I mean, if you want anything, you talk and say this amount of money is for bread, and we will understand, because everything being talked about here, I mean uh…uh… they are listening to, heh."

*Id.* And an additional message to his wife:

> "Listen, I have sent you [Clearing his throat] …I just heard that this guy [Agent note: understood to be a reference to Saleem Alzaq] whom I communicate with in Gaza. This guy [Ah]…I mean he delivers food and things like that not only to the poor, but you don't talk about this with anyone, try to understand what I mean by yourself. He also delivers food to the men, do you understand? So, try to bolster his

---

[1] Yousef was charged in the Middle District of Florida with providing material support to Hamas and other charges and was detained pending trial. *USA v. Yousef*, Middle District of Florida Case 26-285.

> account. I mean disseminate his account. And if you know other people [Ah, ah] ask them to disseminate his account as well."

*Id*. The indictment itself contains overwhelming evidence of the defendants' knowing support of Hamas. *Id.*

After the defendants were arrested, they made numerous calls from jail to relatives and friends that demonstrate they are a flight risk. On September 18, 2026, the same day of their initial appearance and before their first scheduled detention hearing, Omar Adhami advised his wife in a jail call that she should hide their passports in a safe place or with a trustworthy friend:

> Omar asks Amani to hide the passports somewhere safe. Then asks her to disregard that because their calls are being monitored anyway, and the FBI is listening to everything. Amani knows about that ands him not to worry. Omar asks Amani to put the passports in "so and so, the "safe"" which she knows about it. He goes back and tells her he does not mean "safe" because he does not want to mention names, but he wanted her to find a trustworthy friend to keep all these valuables with. She tells him she understands.

Attachment A.[2]

On September 20, 2026, Abdel Adhami, in a phone call to his wife Iman, mentions that he wants his uncle back home to collect a debt and deposit it in his Arab Bank account and then transfer it to the United States. *Id*. It is unknown how many foreign bank accounts Abdel or Omar Adhami may have or how much money may be in those accounts. Abdel does have a significant amount of money that he did not declare on his financial affidavit. In a phone call on September 22, 2026, to his brother Mohammed and Mohammed's wife, Abdel estimated that approximately $1.5 million of his beauty supply store inventory was seized. *Id*. He then told Mohammed that he did not want to disclose much over the phone but he has an equal amount of money that is ready somewhere and always saves and hides money for a rainy day. *Id*. Based upon the phone call,

---

[2] Omar Adhami did eventually surrender both his Jordanian and American passports to the court but not until several weeks after their first scheduled detention hearing.

Abdel Adhami has a significant amount of money that he can access. The FBI seized his domestic bank account so that money therefore must be in a foreign account that he does not want the government to know about. This money was not disclosed on his financial affidavit that resulted in the FPD being appointed to represent him based on need. Rec. Doc. 23.

Omar Adhami, in another phone call, revealed that he has the ability to raise large sums of money from his associates. On September 20, 2026, Omar Adhami spoke with a person named Osama and Osama told him that he brought $10,000 for him and another person named Malik sent Omar another $10,000. Osama also brought a car for Omar's wife, Amani. *See* Attachment A. The same phone call discusses hiring an attorney and reopening the store but nothing would prevent Omar Adhami from using that money and other money raised to assist him and Abdel Adhami in fleeing the jurisdiction and the country.

In that same phone call, Omar advises his wife that they must not sell his house he has in Jordan because it is for them in case anything happens to him. *Id.* This house, along with other houses owned by he and his wife in Jordan and Palestine were not disclosed on his financial affidavit. Rec. Doc. 21. In fact, Omar Adhami, in a phone call with Amani on September 20, 2026, discusses numerous properties owned by himself, his wife and Abdel's wife Iman:

> Amani states if Omar's father, Mohammad and Osama are talking about selling Omar's house in Jordan, they are mistaken because she will not allow them to do that. But it is okay, they can sell Omar's house in Palestine (in the West Bank). Omar agrees stressing they must not sell the Jordan house. Amani adds they should sell Iman's house in Jordan, but not hers. Amani states the ladies are talking about if Iman will sell her house in the West Bank, Amani should sell hers in Jordan. Amani and Omar agree they must not sell that Jordan house. Amani asks if the FBI took the Jordan house contract, Omar denies adding that it is still there [TN: not sure if it is still there in Jordan or in their house in Covington].

*Id.* Although there is discussion in the same call about using proceed from the sale of his Palestinian house for an attorney, nothing would prevent him from using the money for other

means, especially since he now has appointed counsel based upon his financial affidavit, which does not include his house in Jordan, his house in Palestine, or his wife's house in Jordan. Rec. Doc. 21. Abdel Adhami's financial affidavit does mention a home in Palestine but makes no mention of any other foreign property he and his wife own.

The ownership of multiple homes and property in Jordan and Palestine gives the defendants a place to live and resources on which to live should they be able to flee the country. Their failure to include these properties is indicative of a serious risk of flight, especially when compared to the charges and possible sentences to be imposed. This is not a case wherein if a defendant fled, he would have no where to live nor money to support himself. The defendants have significant property and resources in foreign countries.

In other phone calls, Omar Adhami shows the ability to access his foreign bank account and have items moved back and forth from Jordan and Palestine without utilizing the mails or common carriers. In a jail call on September 20, 2026, Omar discusses sending the debit card for his Arab Bank account to his brother-in-law Feras, Amani's brother, so Feras can access the money in the account on Omar's behalf. *Id*. In a phone call the next day, Omar Adhami told his wife that he wanted her to take the debit card to Emad the barber who will deliver it to Feras in Jordan. *Id*. This shows that the defendants can move items back and forth from foreign countries without law enforcement detection.

On September 23, 2026, Amani told Omar Adhami that Feras will receive the debit card on Friday (September 25, 2026). *Id*. Omar utilizes code words and shushes Amani when she mentions the word ATM and asks her not to mention names. *Id*. He further tells Amani that Feras must cash as much as he can and keep the money with him. *Id*. This shows that Omar Adhami does not intend have the money sent to the United States, but to keep it in Jordan for their use

there. Amani, in another call on September 25, 2026, confirmed to Omar that Feras received the debit card. *Id*. This was within four (4) days of Omar Adhami telling his wife to take the debit card to Emad the Barber.

Omar Adhami, in a September 25, 2026, call, gave instruction for Amani to tell Feras that Omar wants him to withdraw "twice the amount of Amani's fingers" from the foreign account. *Id*. He added that he did not want the FBI to lock this account because this is the only money he can hide. *Id*. Omar Adhami told Amani that he wanted Feras to keep withdrawing money from the foreign bank until he reached $30,000. In his financial affidavit, Omar stated that he had about $5,000 to $6,000 in a foreign account. Rec. Doc. 21. This differs greatly from what he said in the jail call. That Omar wants to keep this account secret, have Feras withdraw a large sum of money from it, and keep the money in Jordan is indicative of a risk of flight and the resources to accomplish it.

Abdel Adhami also has significant resources that he did not disclose on his financial affidavit. In a phone call with his brother Mohammad on September 22, 2026, Abdel Adhami estimated the worth of the inventory seized was $1.5 million, plus vehicles and jewelry. *Id*. He said that he did not want to disclose much over the phone but that he has an equal amount of money they lost that is ready somewhere. *Id*. None of this hidden money was declared on his financial affidavit. Rec. Doc. 23. He estimated $2,000 to $4,000 in a foreign account and that his American accounts had been seized. *Id*. This hidden money therefore must be in a foreign account has not been disclosed. This again shows that he has the resources and ability to flee the jurisdiction and country.

Omar Adhami also was willing to stay in communication with Saleem Alzaq, the known Hamas member to whom he was sending money. In a phone call to his wife on September 24, 2026, he asked his wife to reach out to "Shujaie." *Id*. It was testified at the hearing by FBI Special

Agent David Crabtree that Shujaie is a nickname for Saleem Alzaq. His wife replied in the call that she would reach out to her family members in Palestine to contact him. *Id*. Even after being charged with material support of Hamas, Omar Adhami willingly wants to communicate with Hamas.

The jail calls by Abdel Adhami and Omar Adhami show that they have connections to, people, resources and organizations that can and already have raised money for them. The phone calls talk about raising money for attorneys' fees but both defendants have been appointed counsel and certified that do not have the money to hire an attorney. The money already raised and any future money can be used to assist the defendants with flight from the jurisdiction and ultimately the country. They also talk about reopening their stores but Abdel Adhami has admitted that he has at least $1.5 million hidden away. As he said, this money is "ready somewhere." *Id*. This money can be used to facilitate the defendants' flight.

The defendants have already demonstrated that they can move items back and forth from Jordan and Palestine without it being detected. They have citizenship with Palestine and Jordan. Nothing would prevent them from using their significant resources to obtain new passports and then having those passports delivered to them here.

The government contends the rebuttable presumption for detention was not overcome in this case and the defendants now have every reason to leave this jurisdiction and country as they face a very real possible sentence of twenty (20) years imprisonment in this case. The charges against the defendants involve or are intended to involve a federal crime of terrorism. Therefore, the terrorism enhancement under U.S.S.G. §3A1.4 would set a minimum offense level of 32 and criminal history category of VI, regardless of the defendants' prior criminal history. This puts their guideline sentencing range at 210 to 262 months.

Abdel Adhami presented a neighbor, David Deroche as his third-party custodian. Mr. Deroche testified that he had not read the charges against Abdel Adhami and did not know what the case was about. He further testified that he would have no way of knowing what Abdel Adhami was doing in his home and would not know who he was communicating with or have any way of monitoring his actions. He further testified that he would allow Abdel Adhami to use his vehicle and that he would not know what Abdel Adhami was doing, where he was going, or if he was meeting with anyone. He would not be able to monitor Abdel Adhami's actions and be able to report to the court any infractions or know if the defendant fled the jurisdiction.

Omar Adhami presented an elderly aunt who lives in Youngstown, Ohio. He originally requested that he be allowed to move there with his family but the aunt said she would move here to live with the defendant. She testified that she knew the charges against the defendant but did not believe that he did anything wrong or that he would do anything wrong while on bond. She also took offense when asked if she would monitor Omar Adhami's phone and internet use. Omar Adhamai facilitated his communication with Hamas by phone and internet. Nothing would prevent him from doing so when on bond. In fact, he expressed a willingness to communicate with Saleem Alzaq, the Hamas member, even after he had been charged. The aunt would not be able to properly monitor Omar Adhami's communication or actions when he was at home or when he was elsewhere. Because she does not believe will do anything wrong on bond and believes he has done nothing wrong, it is unlikely that she would report any infraction to the court.

The defendants also pose a substantial danger to the community and elsewhere. The knowingly funded a terrorist organization that is involved in massacre thousands of people and stated a war in Israel. Three days after the attack in Israel, Abdel Adhami saw paragliders flying when he was driving on the interstate. He made a video of himself in which shouted:

> "It is on fire; it is on fire! It is on fire, they arrived here, they arrived in America! O Good people, God is the greatest! O boy, they arrived in America! May God protect them! May God bring them victory!"

Rec. Doc. 9. The attack and massacre in Israel was carried out by Hamas militants using paragliders to cross over into Israel. This shows that Abdel supported the invasion and massacre and hoped for a similar event to happen in the United States. He further communicated that if he were able to cross into Gaza he would and that he makes Jihad with money:

> I don't want to be here. By God, if they open this crossing, by God I will be the first one. But what can I do. I ask God almighty that I be one of those who make Jihad with their money.
>
> I prayed for the entire nation and for the Mujahideen, and for all the people and I prayed God that I join them. No matter what I do I fall short. I know myself, I'm falling short.

*Id*. This shows Abdel Adhami's willingness to physically engage in Jihad if he were able to travel. If he is unable to travel, nothing would prevent him from engaging in violent acts here in the name of Hamas, given the potential sentence he is facing.

As noted above, Omar Adhami is not willing to cease communications with Hamas and Saleem Alzaq. His willingness to continue on with a terrorist organization is evidence that he continues to support Hamas and therefore poses a danger.

## CONCLUSION

For the above reasons, the government submits that defendants are a flight risk based on the serious nature of the charges returned by the grand jury, the possible sentence that can be imposed, and the defendants' ties to a foreign terrorist organization, Hamas members, foreign persons, property, and money, the defendants' hiding of assets, and the ability to raise large sums of money establish that the defendants pose a serious flight risk and a significant risk of danger to the community.

The defendants also pose a significant danger to the community based upon their willingness to support Hamas, a terrorist organization that is willing to carry out terrorist attacks and massacres in furtherance of their political agenda, and the defendants' ties to individual Hamas member, Saleem Alzaq and willingness to contact him even after they have been charged. The government believes that there is no condition or combination of conditions that will guarantee their appearance in court and adequately protect the community if Abdel Adhami and Omar Adhami are released on bond.

**WHEREFORE**, for the foregoing reasons, the government respectfully moves this Honorable Court to extend the stay of defendants' release and revoke the magistrate's order of release.

Respectfully submitted,

DAVID I. COURCELLE
UNITED STATES ATTORNEY

*s/Gregory M. Kennedy*

GREGORY M. KENNEDY
Assistant United States Attorney
Louisiana Bar Roll No. 20896
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone No. (504) 680-3102
Email: greg.kennedy@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to defense counsel.

s/ *Gregory M. Kennedy*

GREGORY M. KENNEDY
Assistant United States Attorney